RICHARD SOUZA & others[1] *vs.* SHERIFF OF BRISTOL COUNTY.

Bristol. November 2, 2009. - January 5, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Sheriff. Imprisonment,* Imposition of fees. *County,* Correctional facilities.

Discussion of the common-law origins of the office of sheriff, whose duties may be defined or regulated by the Legislature. [577-580]

Discussion of the current statutory scheme regarding jails and houses of correction, custody and control of which lies with each county's elected sheriff, and the various statutory obligations of the Commissioner of Correction with respect to county correctional institutions. [580-583]

In a civil action by inmates of a jail and house of correction challenging the defendant sheriff's imposition of certain fees, the judge properly granted summary judgment in favor of the inmates, where there was no merit to the claim that G. L. c. 124, § 1 (*r*), authorized the sheriff to impose a fee for haircuts in excess of the amount established by the Commissioner of Correction [583]; and where, with respect to the imposition of fees for "cost of care," medical care, and general education development testing, the sheriff acted in excess of his authority and contrary to the intent of the Legislature [584-589].

CIVIL ACTION commenced in the Superior Court Department on July 29, 2002.

The case was heard by *Richard T. Moses,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Bruce A. Assad & Gary W. Smith* for the defendant.

*James R. Pingeon* for the plaintiffs.

IRELAND, J. The plaintiffs are inmates at the Bristol County jail and house of correction in Dartmouth. In July, 2002, they

[1]Wayne Soares; Barry Booker; Richard Centeno; Antone Cruz; William Perry; William Statkiewitz; and Jerome Wieczorek, Jr., on their own behalf and on behalf of others similarly situated. The plaintiffs brought their action on behalf of themselves and a putative class of similarly situated inmates confined at both the Bristol County jail and house of correction in Dartmouth, and the Ash Street jail in New Bedford. After the proceedings involving this appeal took place, class certification was permitted.

commenced an action in the Superior Court for declaratory and injunctive relief, raising numerous challenges to the imposition of certain fees on them and other inmates by the defendant, the sheriff of Bristol County (sheriff), pursuant to an "Inmate Financial Responsibility Program" (program).[2] The fees include a five dollar per day "cost of care" fee, as well as fees for a number of services, including medical care, haircuts, and general education development (GED) testing. After various proceedings, the parties filed cross motions for summary judgment. A Superior Court judge allowed the plaintiffs' motion and denied the sheriff's motion, concluding that the sheriff lacked authority to impose the cost of care fee, the medical care fee, the haircut fee in excess of $1.50, and the GED fee. He ordered the entry of a declaration stating that those fees "are invalid and unauthorized by law," and permanently enjoined the sheriff and his agents "from imposing the aforesaid fees." Pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), a separate and final judgment entered consistent with his order and from which the sheriff appeals.[3] We transferred the case here on our own initiative. We affirm.

*Background.* The material facts of the case are undisputed. The sheriff implemented the program, which is set forth in a written policy, in July, 2002. By its terms, the program serves "to encourage inmates[4] to be financially responsible," which will "assist [them] in preparing for their transition back [into the community on release]," and helps to "defray[] the cost of incarceration, while still maintaining quality programs and services." As has been stated, under the program the sheriff established and imposed various fees on inmates for their cost of care, medical care, haircut services, and GED testing.

---

[2]The plaintiffs alleged, as relevant here, that the sheriff lacked authority to impose the fees and that the fees violated several of their State and Federal constitutional rights.

[3]In the separate and final judgment, the judge ordered the sheriff, in his official capacity, to reimburse the plaintiffs in various specified amounts, together with interests and costs.

[4]Under the "Inmate Financial Responsibility Program" (program), an "[i]nmate" is "any adult individual confined or committed to a Bristol County correctional facility, or otherwise within the care and custody of the Bristol County Sheriff's Office, including male or female pretrial detainees or sentenced inmates."

The cost-of-care component of the program imposes on inmates a charge of five dollars for each day of incarceration "for administrative services rendered and to assist in defraying the costs of incarceration." The fee is deducted directly from an inmate's "Inmate Money Account" (IMA).[5] The fee is not assessed against "[i]ndigent" inmates[6] and exempts certain inmates.[7] Inmates having "insufficient funds in their IMA to satisfy the [cost-of-care fee] shall have an automatic debit made to their IMA daily, creating a debt owed by the inmate." Where an outstanding balance exists on an inmate's IMA, and funds are sent to the inmate, the amount owed is deducted from the funds sent to the inmate. Inmates who are awaiting trial who are later found not guilty or have the charges against them dismissed "shall have the collected fees reimbursed in full by the [sheriff] upon presentation of certified Docket Entries, or other acceptable court document, indicating these dispositions."

Another component of the program imposes certain charges for medical care and services, including five dollars for medical appointments, three dollars for pharmaceutical prescriptions, and five dollars for eyeglass prescriptions. The fee for medical appointments applies to "[a]ny medical visit initiated by an inmate/detainee through a written request or unscheduled walk-in performed by [the health services unit] not related to a known chronic disease list problem." Several exemptions apply, including medical services for admission health screening, emergency care, prenatal care, laboratory and diagnostic care, contagious disease care, and chronic disease care. Medical care fees are

---

[5]An "Inmate Money Account" (IMA) is an account "established within the Canteen Manager System for an individual inmate for the depositing of all monies received by the inmate and for the payment of fees for goods purchased and/or services provided." The "Canteen Manager System" is "[t]he computer program system which manages the funds deposited into [IMAs] established for each individual inmate upon his/her admission, and the deductions posted for purchases, fees and other debits. The Canteen Manager System is utilized by Commissary staff and Inmate Accounts staff of the Finance Division."

[6]Under the program, an inmate qualifies as "indigent" if he or she has five dollars or less in her IMA for a period of thirty days.

[7]Exempted from the cost-of-care fee are "Federal (INS) inmates (who are NOT being held concurrently on a mittimus issued by a Court of Bristol County)"; "[t]ransfer inmates (who are NOT being held concurrently on a mittimus issued by a Court of Bristol County)"; and "Regional Lockup Inmates."

deducted from an inmate's IMA. No inmate is to be denied access to medical care due to an inability to pay the applicable fee. Indigent inmates receiving medical services "shall be assessed the applicable co-payment fee, which shall be debited against the [inmate's IMA] and creating a debt which shall remain due and payable."

There is also a five dollar fee imposed on inmates who request a haircut or beard trim under the program. The fee is deducted from the inmate's IMA. Indigent inmates are allowed one haircut every month free of charge.

The last fee challenged under the program pertains to GED testing and provides that "[i]nmates who participate in the [GED] testing program shall be charged $12.50 for registration and the battery of tests required." The fee is deducted from the inmate's IMA.

Pursuant to the "general operational procedures" of the program, if an inmate is released with an outstanding debt balance in his IMA (such as debt incurred from cost of service or health care fees), "the Canteen Manager System shall freeze the Inmate's [IMA] and all such outstanding debts shall remain active for a period of two (2) years from the date of release. Should the inmate become incarcerated again within this two (2) year period, all outstanding debts shall become active and the inmate shall be required to pay off these existing debts prior to being allowed to purchase any items." Inmates have no earned funds while incarcerated, that is, they are not given paid jobs. Inmates without funds in their IMAs are unable to purchase items at the jail commissary, such as personal hygiene products, snacks, candy, and playing cards. Indigent inmates are given a hygiene kit free of charge. The kit contains some basic items such as toothpaste, a toothbrush, soap, shampoo, and a disposable razor. Since the program's implementation, the number of indigent inmates has increased.

*Discussion.* The judge concluded that the plaintiffs were entitled to summary judgment on the ground that the sheriff lacked authority to impose the cost of care, medical care, haircut, and GED fees. He did so after thoroughly examining the numerous statutes cited by the parties. We review the entry of summary judgment under well-established standards, to determine whether the successful party has demonstrated that there is no genuine

issue as to any material fact and that it is entitled to a judgment as a matter of law. See *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 454 (2004); *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

As an initial matter, we reject the sheriff's suggestion made during oral argument that, because a sheriff holds a constitutional office, a sheriff may carry out all the functions of his office (putting aside the question of what those functions include) without any statutory authority. While the sheriff correctly acknowledges that there is no enumeration of the duties or functions of the office of the sheriff in the Constitution of the Commonwealth, he overlooks that the office of the sheriff is not *created by* our Constitution. Rather, under our Constitution, as originally established, it was provided that sheriffs in each county were to be appointed by the Governor. Part 2, c. 2, § 1, art. 9, of the Constitution of the Commonwealth. This provision was superseded in 1855 by art. 19 of the Amendments to the Constitution, which states that the Legislature "shall prescribe, by general law, for the election of sheriffs [and other officials]." The constitutional provisions concerning the office of the sheriff do no more than recognize the office and require (currently) an election of sheriffs. Consequently, the duties of the sheriff may be further defined or regulated by the Legislature. Cf. *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 294 (1922); *Opinion of the Justices*, 117 Mass. 603, 604 (1875). See 1 W.H. Anderson, Sheriffs, Coroners and Constables § 42 (1941) (Anderson) ("The powers and duties of a sheriff . . . are still the same today as they were at common law, except, insofar as [the office] has been modified by constitutional and statutory provision").

The sheriff asserts that his power to impose the challenged fees derives from his common-law duties "to operate and administer" the county correctional facilities. Because the Legislature may not "effect[] a material change in or a repeal of the common law unless the intent to do so is clearly expressed," *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 438 (1980), quoting *Pineo* v. *White*, 320 Mass. 487, 491 (1946), the sheriff asserts that the judge's decision (and the resulting judgment) is "derogatory of the common law" and therefore erroneous. The argument lacks support and we reject it.

The office of the sheriff is one of considerable antiquity. The origin and earliest duties of the office is set forth in L.E. Hitch-cock, Powers and Duties of Sheriffs, Constables, Tax Collectors, and Other Officers in the New England States § 4 (2d ed. 1904), as follows:

> "The office of Sheriff dates back to the early days of English history. Indeed it is sometimes claimed that it became a part of the government of England from the Roman law. As the people of England came gradually under one government the territory became divided, more or less arbitrarily, into counties; over each of which was placed an Earl, or Alderman; and this Earl, or Alderman, was supposed to be the ruler — subject of course to the King — over his county. But this Earl, from the privileges which he possessed and the duties which he was under in reference to his attendance upon the King, gradually ceased to exercise his powers himself, and they were in time delegated to an under-officer, called, in the Roman law, Vicecomes; in the Saxon tongue, Shire-reeve; or in the more modern terms, Sheriff. At first this under-officer, or Sheriff, was to administer the affairs of the county as the representative of the Earl; but in time his duties became more defined, and seem to have been fourfold, — as a Judge, as a Keeper of the Peace, as a Ministerial Officer, and as the King's Bailiff.

> "First, as a Judge. He held court and determined causes between parties wherein the value in dispute was not more than forty shillings, and also heard certain other civil causes. He was also the Judge of certain elections, and of the qualifications of voters.

> "Second, as the Keeper of the Peace. Both by common consent and by special commission he became the first man in the county, and superior to all others while he continued in office. He had authority to apprehend persons for the commission of crimes or for breach of the peace, and it was his duty also to defend the county against all enemies of the King, and for this purpose he had power to summon all the people of the county to attend him. This summons every person over fifteen years old and not a peer was bound to obey upon warning.

"Third, as a Ministerial Officer. He was bound to execute all processes issuing from the King's courts of justice. In the commencement of civil proceedings he had power to serve the writ, arrest and take bail, and, when the cause came to trial, to summon and return the Jury, and after the judgment to see that the same was carried into effect. In criminal matters, he had authority to arrest and imprison, to return the Jury, to have custody of the delinquent, and to execute the sentence.

"Fourth, as the King's Bailiff. He was required to see that the rights of the King were preserved in his county, or bailiwick."

With respect to criminal matters, "under the common law the sheriff was ex officio jailer, and that by virtue of his position as such he was the official custodian and in charge of all prisoners confined therein." 1 Anderson, *supra* at § 263.

While the sheriff provides support for the proposition that his authority to manage and control county jails derived from common law,[8] he does not cite to any authority providing that, *under common law*, sheriffs were permitted to *charge fees*, which we conclude is a distinct function not subsumed in his custodial duties. To the contrary, it has been recognized that, "[a]s a general

[8]The sheriff asserts that, under the common law, he possessed authority to manage and control not only county jails, but also houses of correction. It appears, however, that his authority did not originally extend to houses of correction. The Colonial Legislature gave the sheriff authority over local jails under c. 9 of the Province Laws (1699-1700) ("It is enacted . . . [t]hat the sheriff of each several county within this province have the custody, rule, keeping and charge of every of the king's common goals, prisons and prisoners in the same . . ."). See St. 1783, c. 44 ("the Sheriff of each county shall have the custody, rule, and charge of the goal or goals therein, and of all the prisoners within such goal or goals"). See generally Black's Law Dictionary 748-749, 910-911 (9th ed. 2009) (defining "gaol" as term of English origin meaning jail and "gaoler" as jailer). (The parties do not dispute that the term "gaol" refers to "jail.") In 1846, in circumstances when a jail and house of correction were "united in one and the same building or establishment," the sheriff (except in Suffolk County) was given "the custody, rule and charge" over both facilities. St. 1846, c. 11, § 1. In 1859, the Legislature provided that, in all counties except Suffolk, "the jails and houses of correction . . . shall be considered one and the same institution, and the sheriff shall have the custody, rule and charge of the same." St. 1859, c. 249, § 1. Prior thereto, at various times, houses of correction had been run by appointed "masters." See St. 1836, c. 143, § 4; St. 1787, c. 54, § 2.

rule[,] the powers, duties, rights and responsibilities of a sheriff as jailer are prescribed by statute, and as his powers and duties, rights and liabilities, are thus circumscribed by the legislative enactments of the particular jurisdiction . . . ." 1 Anderson, *supra* at § 266. Indeed, in support of his position that, under the common law, he may impose the challenged fees, the sheriff cites only to statutes.[9] Thus, in the absence of any support that imposition of the challenged fees was part of a sheriff's common-law duty, the extensive collection of historical statutes submitted by the parties has no bearing on the issue before us. Rather, we must examine the *current* statutory scheme to determine whether the sheriff is authorized to impose the challenged fees.

Under the current statutory scheme, jails and houses of correction[10] are county correctional institutions; custody and control over jails and houses of correction lie with each county's

---

[9]There is no dispute that, by *statutory authorization*, sheriffs, at various time, were authorized to charge certain fees. See, e.g., Province Laws 1692-1693, c. 37, § 1 (authorizing "gaoler" to charge fees "[f]or turning of the key" on commitment and discharge, and "[f]or diet"), § 2 (prohibiting charge of any fees additional to that prescribed). This statutory authorization, however, has not always been extended to sheriffs. For example, in 1663, the Colonial Legislature authorized the criminal court having jurisdiction over a prisoner, and not a sheriff, to decide whether and how much a prisoner might have to pay for the costs of his "maintenance." General Laws and Liberties of the Massachusetts Colony 128 (1672 ed.). Further, there is also no dispute that, by *statute*, measures were taken, at various times, to prohibit sheriffs from charging and collecting different fees. See, e.g., St. 1859, c. 249, § 2 ("county commissioners . . . establish fixed salaries for all officers, assistants and employees of jails and houses of correction, which shall be the full compensation of said officers, assistants and employees, in lieu of all sums now received by them in their office, for board, turnkey fees, perquisites or otherwise").

[10]Generally, criminal defendants who are charged with a crime are detained in a "jail." G. L. c. 126, § 4. Criminal defendants who are sentenced to a term of two and one-half years *or less* serve that sentence in a "jail" or "house of correction," and criminal defendants who are sentenced to a term of two and one-half years *or more* serve that sentence in a State correctional institution, or prison. See G. L. c. 279, §§ 15, 23, 24; G. L. c. 125, § 1. See *DuPont* v. *Commissioner of Correction*, 448 Mass. 389, 394-395 & nn.12-13 (2007) (explaining that sentences to house of correction are imposed for misdemeanors or less serious felonies while State prison sentences are imposed for felony convictions and involve serious crimes of violence that do not permit sentence to house of correction). Absent exceptional circumstances justifying the exercise of inherent judicial authority, criminal defendants sentenced to a term of more than two and one-half years in a State correctional institution may not be incarcerated in a county jail or house of cor-

elected sheriff. See G. L. c. 126, § 16[11]; G. L. c. 37, § 1; G. L. c. 54, § 159. Prisons are State correctional institutions; custody and control over State prisons and other State correctional institutions lie with a superintendent "[s]ubject to rules and regulations" established by the Commissioner of Correction (commissioner). G. L. c. 125, §§ 1, 14. The commissioner is charged with the establishment, maintenance, and administration of all State correctional institutions, and must "establish and enforce standards for all [S]tate correctional facilities." G. L. c. 124, § 1 (*a*), (*c*). The commissioner is an appointed member of the Commonwealth's executive branch. Superintendents are appointed by the commissioner. G. L. c. 125, § 2.

In addition to the responsibilities concerning all State correctional institutions, the commissioner has various statutory obligations with respect to *county* correctional institutions. For instance, the commissioner is charged with preparing an annual report for the Legislature in which he must, among other obligations, state the "actual condition" of the county correctional institutions and provide the number of inmates in each institution. G. L. c. 124, § 6. The commissioner also must establish "minimum standards for the care and custody of all persons committed to county correctional facilities." G. L. c. 127, § 1A. See G. L. c. 124, § 1 (*d*). Before doing so, the commissioner "shall visit, consult with and receive the recommendations of the sheriffs." G. L. c. 127, § 1A. The commissioner "shall require from the sheriffs . . . periodic reports on the population, operation and conditions of all county correctional facilities." *Id.* In addition, the commissioner is required, "[a]t least once each six months[,] . . . [to] inspect each county correctional facility to determine compliance with minimum standards." G. L. c. 127, § 1B. Inspection results are to be summarized in the commissioner's annual report to the Legislature. *Id.*

rection without the approval of the county sheriff. *Sheriff of Middlesex County v. Commissioner of Correction,* 383 Mass. 631, 634 (1981).

[11]General Laws c. 126, § 16, provides, in relevant part:

> "The sheriff shall have custody and control of the jails in his county, and . . . of the houses of correction therein, and of all prisoners committed thereto, and shall keep the same himself or by his deputy as jailer, superintendent or keeper, and . . . shall appoint subordinate assistants, employees and officers and shall be responsible for them. . . ."

With regard to violations of the minimum standards, the commissioner must give notice of said violations to the sheriff and county commissioners, and afford "a reasonable period of time to remedy" any violation. *Id.* If compliance is not met within a reasonable time, the commissioner may "petition the Superior Court in equity . . . for an order to close the facility or for other appropriate relief." *Id.*

The sheriff contends that, by auditing the program pursuant to the statutory authority under G. L. c. 127, §§ 1A and 1B, and the regulatory authority concerning budget and fiscal management in county correctional facilities, 103 Code Mass. Regs. § 911.03 (2009),[12] and by finding the program to be in "compliance" with the regulations, the commissioner "approved" and "adopt[ed]" the program and the challenged fees therein. This argument ignores the confines of the regulation and the purposes of the commissioner's inspections or audits. Pursuant to 103 Code Mass. Regs. § 911.03, sheriffs must establish written policies and procedures that comply with accepted accounting procedures "for the collection, safeguarding and disbursement of monies," including "inmate funds." See note 12, *supra.* The commissioner's role in the audit of the program is to determine whether those fiscal controls are in place. See 103 Code Mass. Regs. § 901.02 (2009) (purpose of commissioner's inspections is to determine compliance with 103 Code Mass. Regs. §§ 900.00-979.00 [2009]). See also G. L. c. 127, § 1B (commissioner's inspections are to determine compliance with "minimum standards"). Neither the regulations nor the statutory provisions authorizing inspections provide an authorization to impose the challenged fees, nor do they address the challenged fees in particular or the sheriff's authority to impose the challenged fees.

---

[12]Title 103 Code Mass. Regs. § 911.03 (2009) provides as follows:

"Written policy and procedure [of county correctional facilities] shall specify that methods used for the collection, safeguarding and disbursement of monies that comply with accepted accounting procedures established by the parent agency or other authority having jurisdiction. Procedures shall include, but not be limited to: (1) internal controls; (2) petty cash procedures; (3) bonding of appropriate staff; (4) signature control on checks; (5) handling of inmate funds, including accrual of interest; (6) employee expense reimbursement; (7) requisition and purchase of supplies and equipment; [and] (8) issuance or use of vouchers."

Even if the commissioner were to authorize the challenged fees (in the absence of express regulation), the question implicated here — whether the sheriff was statutorily authorized to impose the fees — is a question for the court, not the commissioner.

There is no merit to the sheriff's argument that his imposition of the haircut fee is expressly authorized by statute. With respect to the haircut fee, G. L. c. 124, § 1 (*r*), provides, in relevant part, that:

> "[T]he commissioner . . . shall . . . adopt policies and procedures, in consultation with the county sheriffs, establishing reasonable fees for haircuts that are provided to inmates at any county or [S]tate correctional facility. Except as otherwise provided, the commissioner or county sheriff may charge each inmate a reasonable fee for any haircut provided. . . ."

Pursuant to § 1 (*r*), the commissioner established a haircut fee of $1.50 for inmates in State correctional facilities. The sheriff asserts that, where the commissioner had not established a specific haircut fee for county correctional inmates, § 1 (*r*) authorized the sheriff to charge a fee greater than the one established by the commissioner for State correctional inmates. In support of his argument, the sheriff relies on the "[e]xcept as otherwise provided" clause of § 1 (*r*). That clause, however, does not authorize the sheriff to establish a haircut fee; rather, it prevents him from charging the already established fee if doing so would conflict with some other statutory provision. Pursuant to the plain language of § 1 (*r*), only the commissioner may establish the haircut fees for inmates at both State and county correctional institutions. The commissioner may consult with county sheriffs in establishing the fee, but a sheriff's role in this regard is merely advisory.[13] The Superior Court judge did not err in concluding that the sheriff lacked authority to impose a haircut fee in excess of $1.50 on county inmates.

---

[13]On May 15, 2009, the commissioner amended the regulations expressly to authorize sheriffs to charge county inmates a haircut fee not to exceed ten dollars. See 103 Code Mass. Regs. § 974.08(4) (2009). The amended regulation was not cited or mentioned by the parties. Because it occurred after the judgment entered in this case, the amended regulation is not implicated. We express no view on whether any fee charged pursuant to this amended regulation is "reasonable" pursuant to G. L. c. 124, § 1 (*r*).

Turning to the remaining challenged fees (the cost of care, medical care, and GED fees), the sheriff contends that he is authorized to impose them because nothing in the statutory scheme proscribes them. He also asserts that he may charge these fees pursuant to his broad authority under G. L. c. 126, § 16, see note 11, *supra*, to operate and administer the county correctional institutions. We reject these arguments, noting that they ignore the necessary implications of the over-all statutory scheme concerning the fees that may be imposed by sheriffs and the use of inmate funds in county correctional institutions.

A government agency or officer does not have authority to issue regulations, promulgate rules, or, as in the instant case, create programs that conflict with or exceed the authority of the enabling statutes. *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.*, 412 Mass. 340, 342 (1992). Where the Legislature has fully regulated a subject by statute, a government agency or officer cannot further regulate that subject by establishing a policy inconsistent with the statutory scheme. *Id.* at 347. By imposing the remaining challenged fees, the sheriff acted in excess of his authority and contrary to the intent of the Legislature.

The Legislature has expressly authorized sheriffs to charge certain fees in the performance of their duties. For example, a sheriff may charge certain enumerated fees relative to serving civil and criminal process. See G. L. c. 262, § 8. In connection with a sheriff's service of process function, the Legislature permits a sheriff to "charge for each copy at [a certain prescribed] rate." G. L. c. 262, § 11. In supplementary process proceedings, a sheriff may charge certain fees for copies, travel, and, "[f]or each day's attendance at court on the examination of a defendant or debtor in his custody, . . . [a fee of] five dollars." G. L. c. 262, § 14. In addition, the sheriff is allowed a mileage allowance at a specified rate for the costs associated with transporting inmates to or from court, see G. L. c. 262, § 21, and is allowed "his actual traveling expenses incurred in the performance of his official duties." G. L. c. 37, § 21.

Concerning inmate funds, the Legislature has specifically authorized sheriffs to deduct victim and witness assessments from the noninterest portion of IMAs (and to spend the interest in such accounts for the general welfare of all inmates). See

G. L. c. 127, § 3.[14] In connection with work-release programs for committed inmates of county correctional institutions, the Legislature has authorized sheriffs to make certain deductions from the inmate's earnings. G. L. c. 127, § 86F. Those earnings, "minus tax and similar deductions," are first delivered to the sheriff. *Id.* Then, the sheriff:

> "shall deduct from the earnings delivered to him the following: — First, an amount necessary to satisfy the victim and witness assessment ordered by a court . . . ; second, an amount determined by the sheriff for substantial reimbursement to the county for providing food, lodging and clothing for such inmate; third, the actual and necessary food, travel and other expenses of such inmate when released for employment under the program; fourth, the amount ordered by any court for support of such inmate's spouse or children; fifth, the amount arrived at with public welfare departments; sixth, sums voluntarily agreed to for family allotments and for personal necessities while confined. Any balance shall be credited to the account of the inmate and shall be paid by him upon his final release."

*Id.*

Where the Legislature expressly authorized the sheriff to charge certain fees and to use inmate funds in particular ways and only in circumscribed circumstances, as is the case here, we conclude that the broad authority to have control and custody of county correctional institutions under G. L. c. 126, § 16, does not confer authority to the sheriff to impose the challenged fees.

---

[14]General Laws c. 127, § 3, provides, in pertinent part:

"[T]he . . . keepers of jails, houses of correction and of all other penal or reformatory institutions shall, upon receipt of an outstanding victim and witness assessment, transmit to the court any part or all of the monies earned or received by any inmate and held by the correctional facility, except monies derived from interest earned upon said deposits and revenues generated by the sale or purchase of goods or services to persons in correctional facilities, to satisfy the victim witness assessment ordered . . . . Any monies derived from interest earned upon the deposit of such money and revenue generated by the sale or purchase of goods or services to persons in the correctional facilities may be expended for the general welfare of all the inmates at the discretion of the superintendent."

See *Harborview Residents' Comm., Inc.* v. *Quincy Hous. Auth.*, 368 Mass. 425, 432 (1975) (statutory expression of one thing is implied exclusion of other things omitted from statute). Had the Legislature intended to authorize the sheriff to impose the challenged fees, it would have said so expressly as it had done with other fees, such as fees for service of process, and as it had done by authorizing particular deductions from inmate funds. Our decision in *Commonwealth* v. *Donohue*, 452 Mass. 256 (2008), does not require a contrary result.[15] Thus, in the absence of specific legislative authority for the challenged fees, they are invalid.

A contrary conclusion would frustrate the Legislature's intent, as reflected in the statutory scheme, to recoup or offset the costs associated with incarcerating inmates only in circumstances where an inmate is actually earning income in connection with a work-release program. See G. L. c. 127, § 86F (under work release program, after satisfying victim and witness assessments, sheriff shall deduct "an amount determined by the sheriff for substantial reimbursement to the county for providing food, lodging and clothing for such inmate").[16] It would also, in the case of the GED fee, contravene the clear import of G. L. c. 127, § 92A,[17] to provide inmates with free access to GED testing. We note that, while G. L. c. 127, § 92A, prohibits only the

---

[15]The case of *Commonwealth* v. *Donohue*, 452 Mass. 256 (2008), is inapposite. It did not involve the imposition of fees but, rather, the validity of a global position satellite monitoring program (GPS program) that permitted certain county inmates who had not fully served the committed portions of their sentences to be placed in home confinement. *Id.* at 257. We concluded that G. L. c. 127, §§ 48, 49, and 49A (which gave the sheriff authority and discretion to implement a variety of inmate programs outside a correctional facility), provided specific legislative authorization for the GPS program. *Commonwealth* v. *Donohue*, *supra* at 265, 267. While we took note of G. L. c. 126, § 16, it did not form the basis of our conclusion. *Commonwealth* v. *Donohue*, *supra* at 264.

[16]The sheriff's concerns of a worsening economy, and his desire to "relieve the burden from taxpayers for prison administrative costs," are matters that involve policy considerations that fall within the province of the Legislature.

[17]General Laws c. 127, § 92A, provides:

"The department of education shall permit an inmate of a correctional institution of the commonwealth who is eighteen years of age or over to take the general education development tests, and said department shall not charge an application or testing fee to any inmate desiring to take said tests."

Department of Education from charging GED application or testing fees, it is significant that the statute was included in the provisions relating to penal and reformatory institutions (not under the provisions pertaining to the Department of Education), and, by its terms, applies to both State and county inmates. Last, with regard to the fees for medical care,[18] to adopt the sheriff's position would render G. L. c. 124, § 1 (*t*), superfluous. See *Banushi* v. *Dorfman*, 438 Mass. 242, 245 (2002) ("We do not read a statute so as to render any of its terms meaningless or superfluous"). Under § 1 (*t*), the commissioner "shall as part of the rules and regulations on payments for medical services, require the department of correction[] or the *county correctional facility* to ascertain whether any inmate seeking medical services has health insurance coverage and if said inmate does have health insurance coverage, said health insurance plan *shall be* billed for any services provided" (emphasis added). In view of this provision and the statutory authorization under G. L. c. 124, § 1 (*s*), afforded only to the commissioner to establish medical care fees,

---

[18]There is no dispute that only *the commissioner* is expressly authorized to charge medical service fees. General Laws c. 124, § 1 (*s*), provides:

> "[T]he commissioner . . . shall . . . adopt policies and procedures establishing reasonable medical and health service fees for the medical services that are provided to inmates at any [S]tate jail or correctional facility. Except as otherwise provided, the commissioner may charge each inmate a reasonable fee for any medical and mental health services provided, including prescriptions, medication, or prosthetic devices. The fee shall be deducted from the inmate's account as provided for in [G. L. c. 127, § 48A]. The commissioner shall exempt the following inmates from payment of medical and health services fees: medical visits initiated by the medical or mental health staff, consultants, or contract personnel of the [Department of Correction], prisoners determined to be terminally ill, pregnant, or otherwise hospitalized for more than 30 days successively during the term of incarceration and juvenile inmates and inmates who are undergoing follow-up medical treatment for chronic diseases. Notwithstanding any other provision of this section, an inmate shall not be refused medical treatment for financial reasons. The commissioner shall also establish *criteria for reasonable* deductions from moneys credited to the inmate's account as provided for in [G. L. c. 127, § 48A,] to repay the cost of medical treatment for injuries that were self-inflicted or inflicted by the inmate on others."

General Laws c. 127, § 48A, pertains to work programs in State correctional institutions and to compensation provided to inmates participating in those programs, as well as deductions authorized from inmate earnings.

it is evident that the Legislature intended that billing insurers would be the exclusive manner of seeking reimbursement for medical care given to *county* inmates. See *Habeeb* v. *Retirement Bd. of Quincy,* 389 Mass. 634, 640 (1983) (individual statutory provisions related to same subject matter must be read as whole to effectuate consistent legislative program); *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 513-514 (1975) ("where two or more statutes relate to the same subject matter, they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose").

We reject the sheriff's argument that our decision in *Ciampi* v. *Commissioner of Correction,* 452 Mass. 162 (2008), requires a different result. The plaintiff in *Ciampi,* a prison inmate, challenged the Department of Correction's (department's) regulations and policy that allowed it to withdraw funds from his savings and personal account to satisfy a restitution sanction in a disciplinary action. *Id.* at 163. Although we concluded that "restitution as a disciplinary sanction is a part of the [commissioner's] broad grant of statutory authority to maintain prison discipline," *id.,* the commissioner acted pursuant to a *regulation* that expressly authorized her action, *id.* at 165. In determining that the commissioner did not exceed her authority in enacting the challenged regulations, we noted the well-settled principle that a "highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency." *Id.* at 166, quoting *Massachusetts Fed'n of Teachers* v. *Board of Educ.,* 436 Mass. 763, 771 (2002). We were also guided by the familiar standard that, when the Legislature vests an agency with "broad authority to effectuate the purposes of an act, 'the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation." ' " *Ciampi* v. *Commissioner of Correction, supra* at 168, quoting *Levy* v. *Board of Registration & Discipline in Med.,* 378 Mass. 519, 524 (1979). We concluded that the challenged regulations and policy were consistent with the commissioner's broad grant of authority and with the Legislature's intent. *Ciampi* v. *Commissioner of Correction, supra.* This case, however, involves an action taken by the sheriff, not the commissioner, and does not involve an action that was expressly authorized by regulation.

Finally, we note that there is no merit to the sheriff's contention that, concerning the medical care fee, the judge ignored precedent that this fee is authorized. The sheriff's contention is based on a Superior Court decision that carries no precedential value. See *id.* at 169 n.11.

*Conclusion.* For the reasons stated, we affirm the judge's decision allowing the plaintiffs' motion for summary judgment and denying the sheriff's motion. The judgment entered pursuant to Mass. R. Civ. P. 54 (b) is affirmed.

*So ordered.*