NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13841

CROWN COMMUNITIES, LLC  vs.  PHILIP AUSTIN, trustee,[1] & another.[2]


Barnstable.     March 2, 2026. - June 5, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.


Manufactured Housing Community.  Real Property, Right of first refusal, Purchase and sale agreement.  Practice, Civil, Standing, Declaratory proceeding.  Statute, Construction.  Notice.  Lis Pendens.  Declaratory Relief.  Contract, Interference with contractual relations.  Consumer Protection Act, Unfair act or practice.  Words, "Reasonable evidence."



Civil action commenced in the Superior Court Department on February 20, 2020.

Following review by the Appeals Court, 105 Mass. App. Ct. 113 (2024), findings of fact and rulings of law were issued by Michael K. Callan, J.

The Supreme Judicial Court granted an application for direct appellate review.


Kenneth S. Leonetti (Mark D. Finsterwald & Jasmine N. Brown also present) for the plaintiff.

---

[1] Of the Charles W. Austin Trust.

[2] Pocasset Park Association, Inc.

Thomas W. Aylesworth (Claire A. Todd also present) for Pocasset Park Association, Inc.

Michael N. Turi, Assistant Attorney General (Daniel A. Less, Assistant Attorney General, also present) for the Attorney General.

Nicholas Hoisington, Spenser Templeton, & W. Scott Simpson, of Alabama, & Jessica Savino, for Manufactured Housing Institute, amicus curiae, submitted a brief.

Alycia M. Kennedy, Jane Edmonstone, Benjamin Levine, Destin Germany, Richard M.W. Bauer, Daniel Ordorica, & Joel Feldman, for Massachusetts Law Reform Institute & others, amici curiae, submitted a brief.

WENDLANDT, J.  The Manufactured Housing Act, G. L. c. 140, §§ 32A-32S (act), provides tenants residing in a manufactured housing community with a right of first refusal before the property on which the community is located may be sold.  See G. L. c. 140, § 32R (c).  The act was designed to "avoid discontinuances of manufactured housing communities and to ensure that tenants of such communities are not left at the peril of their landlords due to a practical inability to relocate a manufactured housing unit"; it enables resident tenants, or pertinently an incorporated association representing at least fifty-one percent of them, "to purchase the land on which their homes exist."  Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 86 (1996) (Greenfield).  The right, however, is subject to certain requirements, including that such an association submit to the property owner "reasonable evidence that the residents of at least fifty-one percent of the occupied

homes in the community have approved the purchase of the community by such . . . association."  G. L. c. 140, § 32R (c).

This case presents the question whether the requisite "reasonable evidence" includes resident tenants' signatures affixed to a petition stating that the signatories approve of the association's purchase.  We conclude that it does and that, accordingly, the Pocasset Park Association, Inc. (association), presented reasonable evidence that at least fifty-one percent of the tenants residing at the Park at Pocasset (park), a manufactured housing community located on property (property) in Bourne owned by the Charles W. Austin Trust (trust), supported the association's purchase of the property.  We further conclude that the association failed to meet a second requirement of the right of first refusal -- that the association obtain "a binding commitment for any necessary financing or guarantees within an additional ninety days after execution of the purchase and sale agreement."  G. L. c. 140, § 32R (c).  Therefore, we reverse so much of the amended judgment of the Superior Court as holds that the association validly exercised the right of first refusal.[3]

---

[3] We acknowledge the amicus briefs submitted by the Attorney General; the Manufactured Housing Institute; and the Massachusetts Law Reform Institute, the National Consumer Law Center, the Lake Onota Village Association, Inc., the Manufactured Home Federation of MA Inc., and the Lincoln Institute of Land Policy.

1.  <u>Statutory framework</u>.  First enacted in 1939 and, as relevant here, amended in 1986 and 1993, the Manufactured Housing Act evinces the Legislature's intent to preserve manufactured housing communities in recognition that these communities "provide a viable, affordable housing option to many elderly persons and families of low and moderate income, who are often lacking in resources."  <u>Greenfield</u>, 423 Mass. at 83.  See St. 1986, c. 317, § 1 (statutory preamble recognizing that absent legislative intervention, "increasing shortage of mobile home park sites and increasing costs of relocation will generate serious threats to the public health, safety, and general welfare of the citizens of the commonwealth, particularly the elderly and persons of low and moderate income").

To protect tenants of manufactured housing communities, the act first requires that the owner of the property on which a manufactured housing community is situated "give notice to each resident . . . of any intention to sell . . . the land on which the community is located for any purpose . . . at least forty-five days before the sale . . . occurs."  G. L. c. 140, § 32R (<u>a</u>).  The notice must also set forth the tenants' rights under § 32R, as described <u>infra</u>.

Before any sale of the property to a buyer who intends to maintain the property as a manufactured housing community,[4] the property owner "shall give each resident [of the community] . . . notice" of "any bona fide offer for such a sale . . . that the owner intends to accept," but, as relevant here, "only if . . . an incorporated home owners' association . . . representing more than fifty percent of the tenants residing in such community notifies the manufactured housing community owner . . . in writing, that such persons desire to receive information relating to the proposed sale."[5]  G. L. c. 140, § 32R (b).  "Any notice of the offer . . . shall include the price, calculated as a single lump sum amount which reflects the present value of any installment payments offered and of any promissory notes offered in lieu of cash payment."  Id.

Upon notice of the "third party bona fide offer to purchase that the owner intends to accept," an "association of residents

---

[4] The act also provides that "[b]efore a manufactured housing community may be sold or leased for any purpose that would result in a change of use or discontinuance, the owner shall notify each resident of the community, with a simultaneous copy to the attorney general, the secretary of housing and livable communities, and the local board of health, by certified mail of any bona fide offer for such a sale or lease that the owner intends to accept" (emphasis added).  G. L. c. 140, § 32R (b).  Because Crown intends to continue using the property as a manufactured housing community, this provision does not apply in the present circumstances.

[5] See discussion infra.

representing at least fifty-one percent of the manufactured home owners residing in the community which are entitled to notice [because the association has notified the owner that it desires to receive information relating to a proposed sale, as discussed supra] . . . shall have the right to purchase . . . the said community for purposes of continuing such use thereof," subject to certain requirements.  G. L. c. 140, § 32R (c).

Specifically, the association must

> "(1) submit[] to the owner reasonable evidence that the residents of at least fifty-one percent of the occupied homes in the community have approved the purchase of the community by such . . . association, (2) submit[] to the owner a proposed purchase and sale agreement . . . on substantially equivalent terms and conditions within forty-five days of receipt of notice of the offer made under subsection (b) of this section, (3) obtain[] a binding commitment for any necessary financing or guarantees within an additional ninety days after the execution of the purchase and sale agreement . . . , and (4) close[] on such purchase . . . within an additional ninety days after the end of the ninety-day period under clause (3)."

Id.  Unless the time periods stated in G. L. c. 140, § 32R (c), have been "extended by agreement," failure to meet them "shall serve to terminate the rights of such residents to purchase . . . the manufactured housing community."  Id.

By creating a process to purchase the property upon which the manufactured housing community is located, the act "creates stability" for resident tenants[6] and "promotes [the] continued

---

[6] General Laws c. 140, § 32R, affords a right of first refusal to tenants residing in the community (or a group or

existence of affordable housing." Greenfield, 423 Mass. at 86.
We have recognized that "[i]t is difficult to imagine a more
appropriate and close-fitting method to further the legitimate
interest of the Commonwealth." Id. Significantly, because the
statutory right of first refusal "minimally limits an owner's
freedom to transfer property in that the owner must offer the
property to the tenants on substantially the same terms and
conditions as contained in a bona fide offer of purchase," we
have concluded that the act is constitutionally sound. Id. at
86-87.

   2.  Background.  The park is a manufactured housing
community located on the property owned by the trust.  The park
consists of eighty-one homes, which are occupied by resident

---

association representing at least fifty-one percent of such
resident tenants); subtenants and nonresident tenants do not
have a right of first refusal.  See G. L. c. 140, § 32R (b) (if
"more than fifty percent of the tenants residing in such
[manufactured housing] community or an incorporated home owners'
association or group of tenants representing more than fifty
percent of the tenants residing in such community notifies the
manufactured housing community owner . . . that such persons
desire to receive information relating to the proposed sale or
lease," owner must supply requested information [emphasis
added]); G. L. c. 140, § 32R (c) (upon receipt of notice of
proposed sale, "[a] group or association of residents
representing at least fifty-one percent of the manufactured home
owners residing in the community which are entitled to notice
under paragraph [b]," because association notified owner that it
desires to receive information relating to proposed sale, "shall
have the right to purchase . . . the said [manufactured housing]
community for purposes of continuing such use thereof" [emphases
added]).

tenants and subtenants.  The trust had been seeking to sell the property since 2018, but as discussed infra, it did not notify the park's residents of this intention until November 2019.

a.  Agreement with Crown.  On November 15, 2019, the trust entered into a purchase and sale agreement with Crown, a company in the business of operating manufactured housing communities, to sell the property for $3.8 million in cash.  The agreement expressly acknowledged that Crown's purchase was subject to the right of first refusal afforded to manufactured housing tenants under G. L. c. 140, § 32R, and required that the trust send notice of the pending transaction to the park's residents.

On November 20, 2019, five days after the trust signed the agreement with Crown, the trust sent notice of the proposed sale to all persons known by the trust to be residing in the park. The notice included information about the right of first refusal, a copy of G. L. c. 140, § 32R, and a copy of the purchase and sale agreement with Crown.

b.  Agreement with the association.  In response to the notice, some resident tenants contacted the Cooperative Development Institute (CDI), a nonprofit group with a mission to assist tenants to form resident-owned cooperatives to purchase property as provided by G. L. c. 140, § 32R.  CDI representatives explained the process for exercising the right of first refusal under G. L. c. 140, § 32R, and assisted the

resident tenants to incorporate the association to represent those interested in purchasing the property.

CDI also provided the resident tenants with a form petition to gather signatures of others interested in exercising their right of first refusal.  The organizing resident tenants began gathering support to purchase the property, sometimes exerting what the judge described as "some undue coercive pressure" upon residents; eventually, they gathered sixty-one signatures[7] on a petition stating that the signatories sought to exercise their right of first refusal and to authorize the association to purchase the property.  Some tenants also signed agreements to become members of the association, and eight such agreements were admitted in evidence at trial.

In a letter dated January 2, 2020, the association notified the trust that the resident tenants were exercising their statutory right of first refusal.  The association enclosed a purchase and sale agreement dated December 30, 2019, by which the association offered to purchase the property for $3.8 million subject to a mortgage contingency, and the signed petition.  The petition was not accompanied by an affidavit

---

[7] The trial judge found that forty-four of the signatures were from resident tenants and that the remainder of the signatures were either from subtenants who did not own their homes, from owners who did not reside at the park, or duplicates.

attesting to the validity of the signatures.  These documents -- the letter, the purchase and sale agreement executed by the association, and the signed petition -- were sent to the trust within forty-five days of the trust's November 20, 2019, notice regarding its agreement with Crown.

Five days later, on January 7, 2020, the trust executed the association's proposed purchase and sale agreement.  In accordance with the agreement, on January 17, 2020, the association placed a $50,000 deposit in escrow; the deposit funds were provided by Resident Ownership Capital, LLC (ROC), a nonprofit affiliated with CDI that provides loans to resident tenants of manufactured housing communities to help finance the purchase of the land on which their homes are situated.

With CDI's assistance, the association eventually applied for loans to finance the purchase of the property and for capital improvements.  On July 13, 2020, more than six months after the execution of the purchase and sale agreement by the trust, the association received a letter from ROC approving a $3,982,000 loan to finance the acquisition of the property; on July 10, 2020, the association had received a letter from BlueHub Loan Fund, Inc., approving a $900,000 subordinate acquisition and construction loan to cover capital improvement

projects and deferred maintenance work.[8]  In short, the
association did not obtain the necessary financing within ninety
days after the execution of the purchase and sale agreement on
January 7, 2020.  No extension of the statutory deadline to
secure financing was sought by the association or agreed to by
the trust, and the record is devoid of any information
concerning any attempts by the association to secure financing
prior to July 2020.

    c.  <u>Crown's outreach to resident tenants</u>.  In response to
the association's exercise of the right of first refusal, Crown
began contacting resident tenants to encourage them to support
Crown's purchase of the property.  In its communications with
resident tenants, Crown touted its reputation as a skilled
operator of manufactured housing communities and its superior
ability to handle the park's deferred maintenance work.  Crown
also enclosed a form on which resident tenants could indicate
support for Crown's purchase of the property and withdraw
support for the association's purchase.  In one letter, Crown
told resident tenants that they would receive a fifty dollar
gift card in exchange for a signed withdrawal form.[9]

---

[8] The park had been subject to a roughly decade-long court-
ordered receivership for a failed septic system and had
substantial outstanding maintenance needs.

[9] Four signed withdrawal forms were admitted in evidence.

Some of Crown's letters also stated that, under the association's management, resident tenants would lose rent control rights; yet, under local and State law, they enjoyed no rent control rights regardless of whether the association purchased the property. Crown further told resident tenants that if it succeeded in purchasing the property, it would offer them the "Crown Guarantee," which included a $5,000 credit towards home remodeling, a home bonus program in which Crown would buy a tenant's home for $10,000 over the appraised value, and a home "[t]rade [u]p" program permitting residents to purchase a new home from Crown at "dealer invoice cost." Around the same time that Crown was trying to persuade resident tenants to support its purchase, Crown commenced legal action against the trust and the association. See discussion infra.

3. Procedural history. In February 2020, Crown commenced the present action against the trust and the association, asserting, inter alia, a claim for declaratory relief as to the relative rights of Crown and the association with respect to the property. Crown also filed an ex parte motion for a memorandum of lis pendens with respect to the property, which was allowed. These events transpired prior to the statutory deadline for the association to secure the financing necessary to purchase the property.

In response, the association asserted, inter alia, a claim for declaratory relief against Crown and the trust whether the association had validly exercised the right of first refusal and whether it was subject to the ninety-day financing deadline stated in G. L. c. 140, § 32R (c);[10] a claim for declaratory relief against the trust whether it unreasonably delayed the association's ability to close on the sale and to obtain a binding financing commitment; a claim for tortious interference against Crown based on its alleged interference with the association's contract to purchase the property; and a claim for unfair or deceptive practices in violation of G. L. c. 93A, § 11, against Crown based on the same acts supporting the tortious interference claim.

In December 2022, following a jury-waived trial, a Superior Court judge determined that the association did not lawfully exercise the statutory right of first refusal pursuant to G. L. c. 140, § 32R, and that the trust was required to sell the property to Crown. The judge found that the association did not represent more than fifty percent of resident tenants entitled

---

[10] In response to Crown's complaint, the trust similarly asserted a claim against Crown and the association seeking declaratory relief whether Crown or the association had a valid contract with the trust and whether the association had satisfied the statutory requirements of G. L. c. 140, § 32R. The trust did not participate in the present appeal.

to notice under G. L. c. 140, § 32R (b), as only eight membership forms were admitted in evidence. He also found that the association did not secure the requisite support for its purchase of the property. The judge also entered judgment in Crown's favor on the association's tortious interference and G. L. c. 93A counterclaims.

The association filed a motion to alter or amend the judgment under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), which was denied. The judge concluded that the association had failed to provide "reasonable evidence" of at least fifty-one percent support for the association's purchase of the property because "[t]he pages of the signed petition were not submitted with any verification." The association appealed.

In December 2024, the Appeals Court vacated the judgment and denial of the motion to alter or amend the judgment, except with respect to a counterclaim not relevant to the issues on appeal. Crown Communities, LLC v. Austin, 105 Mass. App. Ct. 113, 125 (2024). The Appeals Court concluded that the judge erred in looking at the number of signed membership agreements rather than the number of signatures affixed to the petition approving the association's purchase when assessing whether the association represented at least fifty-one percent of resident tenants. Id. at 119. The Appeals Court further concluded that the judge's finding that the petition did not meet the fifty-one

percent threshold was erroneously based on a mathematical error in tallying the number of signatures. Id. at 119-120. Additionally, the Appeals Court determined that Crown was estopped from challenging the association's failure to meet the ninety-day financing deadline because it had filed a memorandum of lis pendens, "the purpose of which is precisely to hamper the sale of the property and the ability to obtain financing for it." Id. at 122.

On remand, the judge, without taking additional evidence or reopening the record, determined, inter alia, that the association lawfully exercised its right of first refusal and that the trust was obligated to sell the property to the association.[11] The judge again entered judgment in favor of Crown on the association's tortious interference and G. L. c. 93A counterclaims. Both Crown and the association appealed. Crown petitioned for direct appellate review, which we allowed.

4. Discussion. a. Standing. Before we turn to the question whether the association validly exercised the right of first refusal, we consider the association's contention that Crown lacks standing to bring a claim for declaratory relief whether the association satisfied the requirements of G. L.

---

[11] The judge also concluded that the association failed to show that the trust unreasonably delayed closing or prevented the association from obtaining financing timely.

c. 140, § 32R.  Because "[t]he issue of standing may be raised at any time," there is no waiver of the issue, and we reach the issue although the association has not raised it previously. Matter of the Receivership of Harvard Pilgrim Health Care, Inc., 434 Mass. 51, 56 (2001).

To establish standing for declaratory relief, Crown must show that it has a definite interest in the matter in the sense that its rights will be significantly affected by any declaration on the contested point.[12]  See Bortolotti v. Hayden, 449 Mass. 193, 196-198 (2007) (third-party purchaser had standing to challenge validity of contractual right of first refusal because "[t]he resolution of the contested point presented by his verified complaint, and any resulting declaration, [would] have a significant impact on his rights").

_____

[12] Relying on case law regarding standing to challenge an administrative action, the association contends that Crown lacks standing because its interests do not fall within the "zone of interests" protected by G. L. c. 140, § 32R, and the association did not "violate[] some duty owed to [Crown]."  School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 579-580 (2007), quoting Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 135 (2000). See School Comm. of Hudson, supra at 580, quoting Enos, supra at 136 (in declaratory relief case challenging administrative action, "we pay special attention to the requirement that standing usually is not present unless the government official or agency can be found to owe a duty directly to the plaintiffs").  The analysis is inapposite.  Crown is not challenging the validity of G. L. c. 140, § 32R, or some administrative action taken pursuant to the act; rather, it is seeking a declaration of the relative contractual rights of parties with respect to a private sale of land.

Generally, resolving uncertainty around an entity's "contractual rights is a proper subject of a declaratory judgment proceeding." Sahli v. Bull HN Info. Sys., Inc., 437 Mass. 696, 705 (2002). See School Comm. of Cambridge v. Superintendent of Sch. of Cambridge, 320 Mass. 516, 520 (1946) ("The determination of contractual rights has been a frequent subject of declaratory proceedings").

The resolution of whether the association validly exercised the right of first refusal will have a significant and immediate impact on Crown's rights by clarifying whether Crown has a valid and enforceable contract to purchase the property. Crown thus has standing. Accordingly, we turn to consider Crown's challenges to the validity of the association's exercise of the right of first refusal under G. L. c. 140, § 32R.

b. Fifty-one percent support. i. Reasonable evidence. As discussed supra, in order to exercise the right of first refusal, the association had to submit to the trust, within forty-five days of notice of the intended sale to Crown, "reasonable evidence that the residents of at least fifty-one percent of the occupied homes in the community have approved the purchase of the community by [the association]." G. L. c. 140, § 32R (c). Pursuant to G. L. c. 140, § 32S, the Attorney General has issued a regulation providing that "[f]or purposes of determining residents' rights to purchase" under G. L.

c. 140, § 32R (c), "reasonable evidence . . . shall include, without limitation, a document signed by such persons."[13] 940 Code Mass. Regs. § 10.09(3)(a) (1996).

Consistent with the regulation, the association notified the trust of its intent to exercise the right of first refusal and submitted the petition with sixty-one signatures as evidence that at least fifty-one percent of resident tenants supported its purchase of the property. Crown contends that the signed petition did not qualify as "reasonable evidence" of fifty-one percent support; instead, Crown asserts, "reasonable evidence" is, at a minimum, evidence averring that the signatures are authentic, nonduplicates, knowingly provided, and from persons eligible to exercise the right of first refusal.

The act does not define the term "reasonable evidence." Accordingly, we turn to its plain meaning. See Garcia v. Steele, 492 Mass. 322, 326 (2023) ("unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" [citation omitted]); Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006) (we construe statute "according to the

_____

[13] The Legislature granted the Attorney General the authority to "promulgate such rules and regulations as he [or she] deems necessary for the interpretation, implementation, administration and enforcement of" G. L. c. 140, § 32R. G. L. c. 140, § 32S.

intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished" [citation omitted]).  "Where, as here, the Attorney General is authorized to interpret a statute, her interpretation is entitled to substantial deference, unless it is inconsistent with the plain language of the statute."  Boelter v. Selectmen of Wayland, 479 Mass. 233, 242 (2018).

The term "reasonable" ordinarily means that which is "[w]ithin sensible or rational limits," "[a]ccording to reason," or "plausible."[14]  Black's Law Dictionary 1520 (12th ed. 2024).  See Black's Law Dictionary 1265 (6th ed. 1990) (defining "[r]easonable" as "[f]it and appropriate to the end in view" or "agreeable to reason").  The term "evidence" is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact."  Black's Law Dictionary 696 (12th ed. 2024).  See Black's Law Dictionary 555 (6th ed. 1990) (defining "[e]vidence" as "[t]estimony, writings, or material objects offered in proof of

---

[14] See Black's Law Dictionary 1392 (12th ed. 2024) (defining "plausible" as "[c]onceivably true or successful" or "possibly correct or even likely"); American Heritage Dictionary of the English Language 1388 (3d ed. 1992) (defining "plausible" as "[s]eemingly or apparently valid, likely, or acceptable").

an alleged fact or proposition").  Thus, the plain meaning of "reasonable evidence" within G. L. c. 140, § 32R (c), includes a document signed by resident tenants.  Such a document tends to make it "plausible," Black's Law Dictionary 1520 (12th ed. 2024), or "agreeable to reason," Black's Law Dictionary 1265 (6th ed. 1990), that fifty-one percent of resident tenants support the exercise of the right of first refusal.  The Attorney General's construction is consistent with the act's plain meaning and hence entitled to deference.

This construction finds further support in the structure of the act, which shows it is "[w]ithin sensible or rational limits" to permit resident tenants to show the requisite support through a signed petition.  Black's Law Dictionary 1520 (12th ed. 2024).  To exercise the right of first refusal, an association first must submit to the property owner reasonable evidence that at least fifty-one percent of the resident tenants support its purchase of the property.  G. L. c. 140, § 32R (c).  Under the act, "[e]very holder of a license for a manufactured housing community shall keep or cause to be kept, in permanent form, a register in which shall be recorded the true name . . . , address and registration of each owner of a manufactured home or motor vehicle renting space in such community."  G. L. c. 140, § 32I.  Thus, a property owner licensed to maintain a manufactured housing community may assess the validity of the

signatures on a petition by comparing them to the names of resident tenants in the rent register. See G. L. c. 140, § 32R (c) (property owner may not "unreasonably refuse to enter into, or unreasonably delay" sale to residents who properly exercise right of first refusal).

This construction also is bolstered by the purpose of the act. As noted supra, the act was enacted to "promote[] [the] continued existence of affordable housing" by creating a workable process for low to moderate income individuals to purchase the land upon which their homes sit. Greenfield, 423 Mass. at 86. At the same time, the act provides resident tenants with a forty-five day deadline from the date of notice of a third-party offer to gather the support necessary to exercise the right of first refusal. See G. L. c. 140, § 32R (c). Reading into the phrase "reasonable evidence" a requirement for affidavits or certifications as Crown proposes would run counter to the act's aim to protect the resident tenants of manufactured housing communities, many of whom are elderly or individuals of low or moderate income, by facilitating their purchase of the property on which their community is located. See Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 329 (2011) ("A statute must be interpreted in such a way as to effectuate the legislative intent underlying its enactment").

As the Attorney General notes in her amicus brief, the act's legislative history also indicates that the formality demanded by Crown is inconsistent with the Legislature's intent. In particular, when the Legislature initially added G. L. c. 140, § 32R, in 1986, it imposed a higher burden on resident tenants seeking to exercise the right of first refusal; it required an incorporated homeowners' association to demonstrate by "certified letter" that it had the support of at least fifty-one percent of the resident tenants.  St. 1986, c. 317, § 4.  In 1993, the Legislature eliminated those requirements and permitted resident tenants to exercise the right of first refusal by providing "reasonable evidence" that at least fifty-one percent of them support the association's purchase of the property.  St. 1993, c. 145, § 19.  The amendment evinces a legislative intent to lower barriers for resident tenants seeking to exercise their right of first refusal, consistent with the act's remedial purpose.  See Outfront Media LLC v. Assessors of Boston, 493 Mass. 811, 820 n.7 (2024), quoting Marshfield v. Springfield, 337 Mass. 633, 637-638 (1958) ("'Presumably some change of meaning was intended' by amendment to statute").

Accordingly, we conclude that the Attorney General's construction of "reasonable evidence" as including a document signed by fifty-one percent of resident tenants is consistent

with the plain meaning of the statute. See Souza v. Sheriff of Bristol County, 455 Mass. 573, 588 (2010), quoting Ciampi v. Commissioner of Correction, 452 Mass. 162, 166 (2008) (noting "well-settled principle that a 'highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency'").

Contrary to Crown's contentions, this construction does not preclude judicial review of the authenticity of the signatures or otherwise compel a fact finder to treat forged or duplicate signatures as valid. Where an interested party has a reasonable basis to believe that the signatures are forged or otherwise invalid, a legal challenge may be raised whether the "reasonable evidence" standard has been met. See Commonwealth v. Roman, 470 Mass. 85, 99 (2014) (fact finder "determines what the truth is, based on the evidence that [the fact finder] determine[s] to be credible"). Indeed, this careful fact finding took place here; the judge evaluated the validity of the sixty-one signatures in light of all the evidence at trial, including testimony suggesting that some of the signatures were duplicates, forged, or from subtenants or nonresident tenants ineligible to exercise the right of first refusal.

ii. Fifty-one percent support of resident tenants. The association contends that in assessing whether "at least fifty-one percent of the occupied homes in the community . . .

approved [of the association's] purchase" (emphasis added), G. L. c. 140, § 32R (c), the judge should have considered whether it obtained the support of fifty-one percent of resident tenants in the community rather than fifty-one percent of all occupied homes comprising the community; differently put, the association contends that subtenants should be excluded from the calculation whether the association's purchase of the property enjoyed the requisite support. Crown, by contrast, maintains that all occupied homes, including those occupied by subtenants, must be considered in assessing whether the association has the requisite support.

To be sure, read in isolation the phrase -- "at least fifty-one percent of the occupied homes in the community . . . approved [of the association's] purchase," G. L. c. 140, § 32R (c) -- suggests that the association must show support of fifty-one percent of all occupied homes, regardless of whether a tenant or subtenant resides in the home. However, "[w]e do not construe terms in isolation; instead, we consider the specific language of a provision in the context of the statute as a whole." Garcia, 492 Mass. at 326.

Here, G. L. c. 140, § 32R, concerns "tenants rights" (emphasis added); nothing in the statute concerns the rights of subtenants. G. L. c. 140, § 32R (a). The statute also is clear that it is concerned with certain tenants -- namely, those who

reside in the community.  Specifically, it requires a property owner to provide notice before any sale that will not result in a discontinuance of the property as a manufactured housing community "only if more than fifty percent of the <u>tenants residing in such community</u> or an incorporated home owners' association or group of tenants representing more than fifty percent of the <u>tenants residing in such community</u>" notifies the owner that they desire to receive information relating to the proposed sale (emphasis added).  G. L. c. 140, § 32R (<u>b</u>).  Such a "group or association of residents representing at least fifty-one percent of <u>the manufactured home owners residing in the community</u>" shall have a right to purchase subject to four requirements (emphasis added).  G. L. c. 140, § 32R (<u>c</u>).  Reading G. L. c. 32R as a whole, it is apparent that it is concerned with the rights of resident tenants rather than subtenants and nonresident tenants, and that the association must accordingly show support among resident tenants.

Indeed, Crown concedes that the statute requires that the association represent resident tenants, see G. L. c. 140, § 32R (<u>c</u>) (association "representing at least fifty-one percent of the <u>manufactured home owners residing in the community</u> . . . shall have the right to purchase" [emphasis added]); it would make little sense, as would be the case under Crown's construction, to render the right of first refusal unavailable

to resident tenants when the majority of homes in a community are occupied by subtenants who lack an ownership stake in the community, see Lowery v. Klemm, 446 Mass. 572, 578-579 (2006) ("we will not adopt a construction of a statute that creates 'absurd or unreasonable' consequences" [citation omitted]); Mac's Homeowners Ass'n v. Gebo, 92 Mass. App. Ct. 453, 456-457 (2017) (where property owner owned more than fifty percent of manufactured homes in community, resident tenants could still satisfy fifty-one percent support requirement, as park owner was not resident tenant and therefore his vote and those of his subtenants were excluded from calculation).[15]

c. Request for information. Crown further maintains that the right of first refusal was not available to the association

---

[15] The association asserts that because it had to show the support of fifty-one percent of the fifty-five homes occupied by resident tenants, Crown's contention that the judge erred in counting the signatures of four resident tenants who withdrew their support before closing, and another signature that might have been forged, is immaterial, as the association obtained the signatures of far more than fifty-one percent of all resident tenants. We agree. The association asserts that fifty-five of the eighty-one homes in the park were occupied by resident tenants, a fact supported by the record and that Crown does not contest. See Gossels v. Fleet Nat'l Bank, 453 Mass. 366, 368 n.9 (2009) ("When a trial judge does not make a specific finding, an appellate court may consider stipulated facts, documentary facts, and facts that are not contested and clearly established on the record"). Thus, even subtracting the five signatories at issue, thirty-nine resident tenants supported the association's purchase of the property, which constitutes almost seventy-one percent of all resident tenants.

because it did not comply with the requirement in G. L. c. 140, § 32R (b), that "more than fifty percent of the tenants residing in such [a manufactured housing] community . . . notif[y] the manufactured housing community owner or operator, in writing, that such persons desire to receive information relating to the proposed sale." But the association did not comply with that notification provision because the trust did not "give notice to each resident of the manufactured housing community of <u>any intention to sell</u> . . . the land on which the community is located . . . within fourteen days after the date on which any advertisement, listing, or public notice is first made that the community is for sale" (emphasis added). G. L. c. 140, § 32R (a). Instead, the trust notified residents of its intention only after it entered into the purchase and sale agreement with Crown in November 2019;[16] unaware that the trust intended to sell the property, the resident tenants had no reason to request information about proposed sales under § 32R (b) prior to receipt of the trust's letter informing them of the agreement with Crown.

---

[16] We do not suggest that the trust violated G. L. c. 140, § 32R (a); here, the record shows that the trust provided notice to resident tenants "at least forty-five days before the sale . . . [to Crown] occur[ed]," as allowed by § 32R (a).

We disagree that the act permits a property owner to avoid resident tenants' right of first refusal by failing to provide notice within fourteen days of the public disclosure of its intent to sell under G. L. c. 140, § 32R (a).  The statutory scheme contemplates that the owner will notify residents of an intent to sell, see G. L. c. 140, § 32R (a), and then residents will have the opportunity to organize and request information about any specific offers before the execution of a sale agreement, see G. L. c. 140, § 32R (b); where, as here, that process was not followed until after the trust entered into the purchase and sale agreement with Crown, see note 16, supra, there was no forfeiture of the right of first refusal.

d.  Financing deadline.  As discussed supra, the association was required to "obtain[] a binding commitment for any necessary financing or guarantees within an additional ninety days after execution of the purchase and sale agreement." G. L. c. 140, § 32R (c).  This and the other requirements of the right of first refusal showcase the Legislature's intent to balance the interests of resident tenants and owners of manufactured housing communities alike; the act provides resident tenants with the opportunity to purchase the property on which the community is situated, while protecting the owner's interest in timely transferring the property.  To achieve this balance, the act "minimally limits an owner's freedom to

transfer property in that the owner must offer" the resident tenants the opportunity to purchase the property on "substantially the same terms and conditions as contained in a bona fide offer of purchase" and only so long as they comply with the other statutory requirements of G. L. c. 140, § 32R. Greenfield, 423 Mass. at 87.  The Legislature thus expressly provided that if the resident tenants fail to comply with the enumerated requirements, then "the rights of such residents to purchase or lease the manufactured housing community" are "terminate[d]," and the property owner can proceed to closing with the third-party buyer.  G. L. c. 140, § 32R (c).  In other words, the Legislature has provided resident tenants an opportunity to purchase the land upon which their homes are located in an effort to preserve affordable housing, but compliance with the statutory requirements is mandated in the absence of an agreement with the owner extending the deadlines. See id.; Commonwealth v. Ambrose A., 495 Mass. 135, 140 (2024) ("a statute's remedial purpose does not override the Legislature's intent as expressed by a statute's plain language").

Here, the association failed to comply with this requirement; it executed a purchase and sale agreement with the trust in January 2020 but did not secure a financing commitment until more than six months later in July 2020.  And while G. L.

c. 140, § 32R (c), provides that an association can seek an extension by agreement with the property owner, there is no evidence that the association did so. See G. L. c. 140, § 32R (c) ("The time periods herein provided may be extended by agreement").

On remand, relying on the Appeals Court decision, the judge concluded that the association was excused from complying with the ninety-day financing deadline because the memorandum of lis pendens hampered the association's ability to obtain financing and thus Crown could not complain of the association's failure to meet the deadline. See Crown Communities, LLC, 105 Mass. App. Ct. at 122, citing Augis Corp. v. Massachusetts Comm'n Against Discrimination, 75 Mass. App. Ct. 398, 406 (2009), and Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass. App. Ct. 585, 596 (2007). A party that improperly frustrates another's ability to comply with a deadline may be precluded from taking advantage of the failed compliance created by its own conduct. See, e.g., Augis Corp., supra at 405-406 (affirming sanction barring party from calling key witness where party's counsel refused to produce witness for ordered deposition); Winchester Gables, Inc., supra at 596-597 (defendant could not avoid performing on contract where it structured contract and transaction to create impossibility at

issue; "[o]ne who prevents the performance of a contract cannot take advantage of its nonperformance" [citation omitted]).

Crown contests the determination that the lis pendens frustrated the association's ability to secure a binding financial commitment timely. A memorandum of lis pendens filed under G. L. c. 184, § 15, is a written "notice [to the public] of pending litigation affecting title [to property] through the registry of deeds" (quotation and citation omitted). Wolfe v. Gormally, 440 Mass. 699, 703 (2004). "By putting anyone interested in real estate that is in dispute on notice of the dispute, the statute[, G. L. c. 184, § 15,] ensures that a prospective third-party transferee can, with the exercise of reasonable prudence, acquire information relevant to a decision whether to consummate the transaction." Debral Realty, Inc. v. DiChiara, 383 Mass. 559, 561-562 (1981). We have acknowledged that a lis pendens "interferes with the owner's ability to obtain financing on the property." Id. at 564.[17] And it is

---

[17] Cf. Debral Realty, Inc., 383 Mass. at 564 n.9 ("We stress that the landowner is not prohibited from alienating or encumbering the property subject to lis pendens. Although alienation may be more difficult, there is nothing to prevent the sale if the landowner can find a willing buyer"); id. at 565 (acknowledging "substantial economic effects that can result from the filing of a lis pendens notice [effects that mirror those resulting from the use of a real estate attachment]"); id. at 566 (lis pendens deprives landowner "of no more than the ability to alienate property without informing the prospective transferee of the existence of litigation involving the property").

certainly possible that a lis pendens also may make it more difficult for a prospective purchaser embroiled in the litigation itself to obtain a binding financial commitment for the purchase of the disputed property.

Here, the judge, following the Appeals Court's directive, proceeded on the assumption that the lis pendens hampered the association's ability to obtain financing.[18]  But there was no evidence in this case that it had any such effect.  In particular, the association adduced no evidence that the lis

---

[18] The association cannot rely on the doctrine of judicial estoppel, which permits a judge to preclude a party from taking a position "directly inconsistent" with a prior position (citation omitted).  Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 640-641 (2005) (judicial estoppel applies where, among other things, "the position being asserted in the litigation [is] 'directly inconsistent,' meaning 'mutually exclusive' of, the position asserted in a prior proceeding" [citation omitted]).  For estoppel to apply, Crown would need to have taken the position previously that the financing deadline should be excused or that the lis pendens would have the effect of precluding the association from obtaining a binding financial commitment timely; Crown did not take such a position.  In its motion for a memorandum of lis pendens, Crown asserted that "the subject matter of the action constitutes a claim of right to title to the [p]ark and the [p]roperty, as well as the use and occupancy thereof."  Crown also asserted that there was a "clear danger" that the trust and the association might transfer or encumber the property, noting that there were "financing mechanics currently underway," should the trust or the association be "given advance notice of" the motion.  Finally, Crown stated that it would "longitudinally suffer an irreparable loss of opportunity, profits and goodwill in the event of any such encumbrance, or should title improperly transfer to any other party" during the litigation.  None of these statements is directly inconsistent with Crown's present position.

pendens had any effect on its ability to secure financing timely, that Crown acted in bad faith in filing the lawsuit or for a memorandum of lis pendens, that the association sought financing within the ninety-day window, or that the association sought from the trust an extension of the financing deadline despite the express provision of G. L. c. 140, § 32R (c), permitting an agreed-to extension.  Indeed, the association was able to obtain a binding financial commitment, albeit long after the passage of the statutory deadline, despite the lis pendens. Contrast Augis Corp., 75 Mass. App. Ct. at 405-406 (upholding hearing officer's sanction precluding witness's testimony where employer acted in bad faith in failing to produce witness for deposition timely by engaging in "hardball" tactics).

In fact, the association only identified the lis pendens as a barrier to financing after raising several other rationales. At trial, the association asserted that the trust "unreasonably delayed the [a]ssociation's ability to close on the purchase and sale of the [p]ark" and "prevented the [a]ssociation from obtaining a binding financing commitment within the statutory deadline."  The judge determined that the association failed to support its assertion that the trust unreasonably delayed its ability to close on its purchase of the property, a conclusion that the association does not challenge on appeal. Additionally, in its posttrial briefing, the association

introduced a different reason for its failure to meet the statutory deadline; it argued that this court's COVID-19 emergency orders[19] tolled the ninety-day financing deadline. Only after we concluded in Graycor Constr. Co. v. Pacific Theatres Exhibition Corp., 490 Mass. 636, 645-646 (2022), that the COVID-19 emergency orders tolled only deadlines for court filings did the association marshal the argument that the delay was excusable under principles of equity because Crown's filing of the instant lawsuit and for a memorandum of lis pendens impeded the association's ability to obtain financing.

But the association's argument that the lis pendens impeded its ability to secure financing timely was unsupported; as discussed supra, the record is devoid of any evidence concerning when the association sought financing or the impact of the lis pendens on the loan approval process. See Custody of Eleanor, 414 Mass. 795, 799 (1993) ("A finding is clearly erroneous when

---

[19] See, e.g., Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (Apr. 1, 2020), https://perma.cc/F5V5-TPPB; Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (Apr. 27, 2020), https://perma.cc/JPU4-KUG3; Second Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (May 26, 2020), https://perma.cc/UYT3-U4KP; Third Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (June 24, 2020), https://perma.cc/5K7R-27AT.

there is no evidence to support it").  While a lis pendens may make it more difficult to obtain a binding financial commitment on the disputed property, the existence of a lis pendens does not relieve a party that has failed to ask the owner for an extension of the statutory financing deadline of its burden to show at a minimum that it made good faith efforts to secure financing timely.[20]  See Debral Realty, Inc., 383 Mass. at 560-561, 564.

e.  Association's counterclaims.  The association argues on cross appeal that the judge erred in denying its counterclaims against Crown for engaging in unfair business practices in violation of G. L. c. 93A, § 11,[21] and tortiously interfering

_____

[20] Because we conclude that the association's right of first refusal was terminated once it failed to secure financing timely, we need not reach Crown's further argument that the association's mortgage contingent offer was not "substantially equivalent" to Crown's all cash offer.

[21] To prevail on a claim under G. L. c. 93A, § 11, the association was required to demonstrate an unfair or deceptive act or practice by Crown -- that is, an act or practice that falls "within at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous" (citation omitted).  Nicosia v. Burn, LLC, 496 Mass. 792, 800 (2025). "[F]raudulent misrepresentation is sufficient to establish deception under G. L. c. 93A, § 11."  H1 Lincoln, Inc. v. South Wash. St., LLC, 489 Mass. 1, 18 (2022).  A judge's determination of "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact," which we review for clear error; but a judge's determination of "whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law," which we review de novo (citation omitted).  Nicosia, supra at 799-800.

with the association's contract to purchase the park,[22] both of which were predicated on the same allegations. On appeal, the association first challenges the judge's finding that Crown's inaccurate statements that the tenants would lose rent control rights if the association purchased the property was based on a misunderstanding of the status of rent control in Massachusetts rather than an intentional or reckless misstatement; the association asserts that the judge's finding is "beyond reasonable belief" in view of Crown's sophistication and due diligence. At the least, the association claims, Crown was reckless.

The argument misapprehends the deference we owe to the trial judge, who was best positioned to assess the credibility of Crown's witnesses. See Gossels v. Fleet Nat'l Bank, 453 Mass. 366, 368 n.9 (2009) ("appellate court must defer to the judge on issues of witness credibility"); Mass. R. Civ. P.

---

[22] "To prevail on a claim of tortious interference with a contract, a plaintiff must establish that (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions" (quotation and citation omitted). Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-716 (2011). Here, the judge concluded that the tortious interference claim failed because the association did not prove the third element -- that Crown's interference was improper in motive or means.

52 (a), as amended, 423 Mass. 1402 (1996) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses").  Here, the judge credited the testimony by Crown's representatives that they genuinely, but mistakenly, believed Massachusetts had rent control.[23]  Such incorrect but innocently made statements are not actionable under G. L. c. 93A, as they are not fraudulent misrepresentations and do not otherwise constitute "immoral" or "unscrupulous" conduct.  H1 Lincoln, Inc. v. South Wash. St., LLC, 489 Mass. 1, 14, 18 (2022) (to prove fraudulent misrepresentation, plaintiff must show, inter alia, that defendant made false representation "with knowledge of its falsity" [emphasis added; citation omitted]).  See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15 (1989) (no G. L. c. 93A violation where insurer, "[i]n good faith . . . relied upon a plausible, although ultimately

---

[23] The association's argument that Crown improperly, unfairly, and deceptively told residents that they could be personally liable for park repairs fares no better, as the judge similarly found that there was no improper intent to mislead. Specifically, the judge credited the testimony by one of Crown's representatives that in using the term "liability" he only sought to ensure that residents understood the risks of association ownership.

incorrect, interpretation" of its obligations under insurance policy).[24]

The association's next contention that Crown's offering of "financial incentives to induce [resident tenants] to sign Crown's withdrawal form, alone, qualifies as a violation of [G. L. c.] 93A" similarly ignores our standard of review. Here, the judge, who was best suited to assess credibility, found that Crown had acted in good faith in offering the incentives to win resident tenants' support, and that the incentives -- which resident tenants were free to reject without repercussion -- were noncoercive. Cf. Restatement (Second) of Torts § 768 comment b, at 40 (1979) (business entity may by proper means "seek to divert business from his competitors . . . [a]nd may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services").[25]

---

[24] The association's reliance on Mac's Homeowners Ass'n v. Gebo, 92 Mass. App. Ct. 453 (2017), which concerned whether the allegations of the complaint, when viewed in the light most favorable to the plaintiff, were sufficient to state a claim against a third-party developer, is misplaced.

[25] The association's argument that Crown's complaint was "frivolous" and therefore the filing of the instant lawsuit constituted tortious interference with the association's purchase and sale agreement, and an unfair and deceptive practice, similarly fails. The judge determined that the complaint concerned a good faith dispute over whether the association validly exercised the right of first refusal. See Duclersaint v. Federal Nat'l Mtge. Ass'n, 427 Mass. 809, 814 (1998) ("a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a

The association finally contends that "Crown's actions were clearly the product of an improper motive," but provides no record support for the assertion.  We defer to the judge's finding that Crown was motived by its own economic self-interest, which is supported by the testimony of Crown's representatives that Crown is in the business of managing and buying manufactured housing communities and that Crown has been interested in purchasing the property since 2019.[26]  See Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 588 (2024) (finding no improper motive where defendant "acted in its own corporate self-interest"; "[t]he motivation of personal gain, including financial gain . . . generally is not enough to constitute improper motive" [quotation and citation omitted]).

5.  Conclusion.  We affirm so much of the amended judgment as declares that counts I and III of Crown's complaint alleging breach of contract and detrimental reliance against the trust are moot, and as finds in favor of Crown on counts III and IV of

---

c. 93A claim is made").  The judge's determination was not erroneous.  See Fronk v. Fowler, 456 Mass. 317, 329 (2010) ("A claim is frivolous if there is an absence of legal or factual basis for the claim, and if the claim is without even a colorable basis in law" [quotations and citations omitted]).

[26] Because the judge did not err in rejecting the association's counterclaims, we need not reach the association's argument that the judge erred in discrediting the association's expert regarding the damages it purportedly suffered from the violations.

the association's counterclaims alleging a violation of G. L. c. 93A, § 11, and tortious interference.  We reverse paragraphs one through four of the amended declaratory judgment.

<u>So ordered</u>.